**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  20-211** |
| | : | |
| **ANTHNONY LUCIDONIO, SR.** | : | |
| **NICHOLAS LUCIDONIO** | : | |

_____

**McHUGH, J.**                                                                    **March 15, 2022**

## <u>MEMORANDUM</u>

This is a prosecution for tax fraud, triggered when former employees of a family business contacted the Government through an attorney to volunteer information about purportedly illegal business practices, supported by records taken from the business. Two proffer sessions with prosecutors and an agent of the Internal Revenue Service led to the issuance of a search warrant by a magistrate judge, resulting in the seizure of records and cash.

Defendants now move to suppress any evidence derived from the search.  They argue that the warrant was improperly issued because the Special Agent's affidavit in support of the application recklessly omitted materiel facts that would have undermined the existence of probable cause.  They further argue that the Agent failed to corroborate the information before applying for the warrant. Separately, Defendants contend that the informants who supplied the basis for the affidavit were acting as agent of the Government when they took records from the Defendants' places of business. Finally, they argue that the warrant was overly broad as to the tax years for which records were seized, and invalid with respect to the cash confiscated during the search.  The motion was ably presented by experienced counsel, but having carefully considered the arguments, I find no violation of Defendants' Fourth Amendment rights.  Defendants' motion has therefore been denied, without an evidentiary hearing.

1

## I.    Factual Background

The pending Motion to Suppress focuses on the search and seizure of evidence at Tony Luke's Inc., a retail and cheesesteak outlet in South Philadelphia, and Tony Luke's Commissary, which functions as the administrative offices for Tony Luke's pursuant to warrants issued on March 15, 2017.  The timeline leading up to that search and seizure is as follows.

In or around 2015, a family dispute erupted over Tony Luke's franchising rights and royalties between the owners of Tony Luke's: Defendants Anthony Lucidionio Sr. and Nicholas Lucidonio, and their relative, "Individual A."[1]  Defs.' Mot. at 4, ECF 44.   In the midst of this business dispute among family members, Individual A's sons (referred to as Confidential Informant #1 and #2), two longtime employees of Tony Luke's, took sales and payroll information from Tony Luke's, which purportedly showed a higher amount of sales and payroll figures for Tony Luke's than were reported to the Internal Revenue Services ("IRS").  Defs.' Mot. at 1; Gov. Resp. at 7, ECF 50.  In April 2016, one of the informants was fired from Tony Luke's and the other informant left the company.  Mem. of Interview, Gov. Resp. App. at USA0010 ¶¶27, 28, ECF 50-1.

In May 2016, the informants first retained and spoke to Attorney David Hall, a former Federal prosecutor experienced in white-collar cases. The informants outlined a tax evasion scheme at Tony Luke's which they reported was carried out by their grandfather and uncle. During the meeting, they also expressed their interest in serving as government whistleblowers.  David Hall Decl., Gov. Resp. App. at USA0343-44 ¶3, ECF 50-1.   Attorney Hall reviewed the information provided by the employees, including a thumb drive containing ledgers and documents as to the true sales and payroll for Tony Luke's.  Approximately three months later, after determining that there was evidence of tax fraud, Attorney Hall contacted First Assistant U.S. Attorney Louis Lappen, to discuss the matter.  *Id.*

---

[1] In addition to the civil lawsuits, Defendants allege that in April 2016, the informants threatened to go to authorities if the Defendants did not pay $500,000 and settle the civil lawsuits, which is discussed in more detail below. Def's Mot. at 5; Decl. of Steven E. Angstreich ¶9.

¶¶4-6.  In initial discussions with the Government, Attorney Hall neither disclosed the identities of his clients nor the identity of the business.  *Id.* ¶6.  The Government has represented that before being contacted by Attorney Hall in August 2016, there was no open case regarding tax fraud at Tony Luke's nor had the Government had any contact with the former employees of Tony Luke's.  Gov. Resp. at 9.  In September 2016, AUSA Richard Barrett contacted Attorney Hall to advise that the Government would investigate the case.  Hall Decl. ¶9.  In November 2016, Attorney Hall disclosed his clients' identities, and the lawyers discussed granting immunity.  *Id.* ¶10.  Finally, on January 11, 2017, the informants, represented by Attorney Hall, had a proffer session with the Government,[2] during which they outlined the alleged scheme, and Attorney Hall provided a thumb drive containing the alleged true sales and payroll information for Tony Luke's.  Gov. Resp. at 9; Mem. of Interview, Gov. Resp. App. at USA0001, USA0001-0007, ECF 50-1.  Before this meeting, the informants signed proffer agreements with the Government, immunizing their statements. Proffer/Immunity Letter., Gov. Resp. App. at USA0340-42, ECF 50-1.  There was a second proffer meeting on March 10, 2017.[3] An application for search warrants was then filed with the Court on March 15, 2017, with Special Agent Daniel Harris's executed affidavit attached in support.  Search Warrant Aff., Gov. Resp. App. at USA0305-339, ECF 50-1.  Magistrate Judge Merilyn Heffley issued warrants for searches at Tony Luke, Inc. and Tony Luke's Commissary Inc. Warrants, Gov. Resp. App. at USA0333-39, 306-12.  Agent Harris' affidavit was not attached to the actual search warrants that were issued. Gov. Resp. at 10.

    a.   The Search Warrant Affidavit

The affidavit sworn by Agent Harris chronicled the facts that he found necessary to establish probable cause to believe that evidence, fruits, or instrumentalities of federal tax violations

---

[2] Both counsel of record for the Government in this case attended the proffer session.

[3] One of the prosecuting attorneys in this case attended the second proffer session.

committed by Anthony Lucidonio, Sr. and Nicholas Lucidonio were located at Tony Luke's and Tony Luke's Commissary.  Facts in the affidavit include, but are not limited to:

(i)    CI#1 and C1#2 (informants) provided information to investigators that Defendants were involved in an extensive and ongoing cash skimming and payroll scheme to evade paying proper payroll and income taxes, and the informants have firsthand knowledge of the scheme because they had worked at the businesses for many years, since they were teenagers and into their adult years. Search Warrant Aff. ¶¶8-10.

(ii)   CI#1 provided details regarding a payroll scheme overseen by Nicholas Lucidonio whereby employees were partially paid "under the table" in cash, without any federal income tax withholding or payroll taxes withheld or paid to the IRS, and CI#2 provided details about generating a false payroll report for the company accountant such that employees received only some of their income via the paycheck and received the rest via unreported cash. *Id.* ¶¶11-13.

(iii)  CI#2 provided investigators with copies of excel records and the payroll summaries he prepared for Tony Luke's and Tony Luke's Commissary employees for the periods 2006, 2008, 2009, 2011, 2013, and 2015, which Special Agent Harris then compared to the payroll information contained on the 112S corporate returns filed by the companies.  This comparison indicated a total amount of unreported wages for Tony Luke's employees during those time periods of $1,563,753.28, and a total amount of unreported wages for Tony Luke's Commissary employees during those time periods of $228,048.27, for which no federal income taxes or payroll taxes were withheld from the employees or turned over to the IRS. Furthermore, the payroll tax evasion scheme resulted in the evasion of payroll taxes on approximately $1.8 million in wages for seven years for which the IRS has records. *Id.* ¶¶14-18.

4

(iv)    CI#1 provided details with respect to Tony Luke's use of a point of sales (POS) system to track and record its sales at the time of purchase, after which point he would enter accurate daily reports into an Excel spreadsheet and destroy the POS reports, as directed by Nicholas Lucidonio.   CI#2 provided copies of the excel spreadsheets which he prepared from the Point of Sales documents for years 2006, 2008, 2011, and 2015.  The amount of receipts identified on Excel sheets were compared to receipt amounts reported on Tony Luke's' 1120S tax returns which showed approximately $12,115.076 that had been unreported in business receipts for the periods 2006, 2008, 2009, 2011, 2013, 2014, 2015. *Id.* ¶¶23-26.

The affidavit included additional information as to Special Agent Harris' experience, including his having been employed for over 10 years with the IRS, and having conducted or been involved in numerous financial investigations related to tax crimes. *Id.* ¶¶2-4.  Moreover, the affidavit provided information as to the evidence to be seized, including records of fraudulent transactions, as well as receipts, notes, ledgers on computer files and on paper, and computers. *Id.* ¶¶32-34.

    b.  <u>The Search and Indictment</u>

Federal agents executed the March 15, 2017 search warrants and seized information relevant to the tax fraud scheme, including cash from safes and a desk at the Tony Luke's Commissary location.  Defs.' Mot. at 8.  On July 21, 2020, a federal grand jury sitting in Philadelphia charged both Defendants with crimes related to conducting a substantial tax fraud scheme. Indictment, ECF 1.

    c.  <u>The Motion to Suppress</u>

Defendants argue that the Government violated their Fourth Amendment rights when it obtained the search warrants because the case agent withheld critical information that would have caused the Magistrate Judge to doubt the informants' credibility; the Government failed independently to

corroborate the information provided by the informants; and the "stolen" sales and payroll information were the product of a search conducted on the part of the Government.  Furthermore, Defendants contend that the warrants are overbroad to the extent the government searched and seized records outside of the time period of 2012 to 2015, and invalid to the extent they authorized a seizure of all cash at the locations to be searched.

## II.      Legal Standard

Where a defendant challenges the issuance of a warrant under the Fourth Amendment, the reviewing court need only determine whether the magistrate had a "substantial basis" for concluding that probable cause was present.  *Illinois v. Gates,* 462 U.S. 213, 238 (1983); *United States v. Ritter,* 416 F.3d 256, 262 (3d Cir. 2005).  As the Supreme Court has instructed, "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review."  *Gates,* 462 U.S. at 236.  This standard reflects a substantial level of deference to be afforded the magistrate's decision.  *Id.*

## III.     Discussion

I.      <u>Agent Harris' behavior was not reckless, and in any case, the omissions from the affidavit would not have changed the probable cause determination</u>

*A.  The Probable Cause Determination*

Defendants contend that the search warrant affidavit sworn by Agent Harris painted a "highly misleading picture" as to the informants' credibility, and that an accurate affidavit would not have established probable cause. Defs.' Reply Br. at 7, ECF 53. To prevail on this claim, Defendants must make two showings: first, that the agent, with at least a reckless disregard for the truth, "made false statements or omissions that create a falsehood in applying for a warrant" and second, that "such statements or omissions were material, or necessary to the probable cause determination." *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d

Cir. 1997)).  Defendants have not persuaded me that the agent acted with a reckless disregard for the truth, and probable cause would have existed even if the magistrate judge had been provided with the information omitted from the agent's affidavit.

*B.  Reckless Omissions*

To determine whether information was recklessly omitted, the Court asks whether the officer "withheld a fact in his ken that '[a]ny reasonable person would have known... was the kind of thing the judge would wish to know.'" *Wilson*, 212 F.3d at 787 (citations omitted).  The term "reckless" carries weight here, because the Supreme Court has specifically cautioned that "negligence" or an "innocent mistake" is not sufficient. *Franks v. Delaware* 438 U.S. 154, 171 (1978).  When evaluating a claim of reckless omissions, a court must first determine whether the agent, at the time of the swearing of the affidavit of probable cause, actually had knowledge of the information allegedly omitted.  If so, then a further determination must be made with respect to whether the information was material. *Id.*

Defendants cast a wide net in their description of the facts that the agent purportedly knew. Def's Mot. at 12; Defs.' Ex. 2.  Some of the omissions pertain to Individual A, the informants' father, rather than the informants themselves, and some appear to incorporate facts that Defendants contend the agent would have known had he engaged in further investigation.[4]  The other omissions alleged to have been withheld are that: the informants were related to the defendants;  the informants' father

---

[4] In Defendants' initial motion to suppress, Defendants argued that Agent Harris had failed to disclose 10 material facts.  Prior to the hearing on March 5, 2022, Defendants submitted a list that included an additional 10 omitted facts, for a total of 20 purported omissions. *See* Def's Ex. 2. With respect to the informants' father, he purportedly threatened one of defendants' counsel with criminal ramifications unless civil disputes were settled; he was paid in cash while employed at Tony Luke's; he was terminated from the company for failing to repay loans; that only he, rather than the informants, would have had access to a Tony Luke's tax return that was turned over to the Government. With respect to information that might have followed from further investigation, defendants argue that the thumb drive provided to the government was copied and therefore might have contained data that CI#2 had entered himself, and that the point-of-sale records did not accurately reflect the gross receipts upon comparison with other documents.

was involved in civil litigation against Defendants; the informants had been sued civilly by Defendants for return of the records which was reported on in various newspapers; the informants had tried to extort $500,000 from Defendants in exchange for returning the records they had "stolen;" the informants threatened to go to the Government if their civil demands were not met; the informants were in part also paid in cash at Tony Luke's/Tony Luke's Commissary; one of the informants had a substance abuse history and an arrest record; the informants "stole" records as part of a "backup plan" to protect their own interests;  the thumb drive that informants provided to the government was not the original thumb drive on which the informants had copied financial records; the informants had secured immunity from prosecution in exchange for information they were providing to the government; and one of the informants had been fired from Tony Luke's in April 2016.

The Government disputes that Agent Harris was aware of all the omissions listed by Defendants at the time of the swearing of the affidavit.  For instance, the Government argues that Defendants have not and cannot show that Agent Harris was aware of a lawsuit filed by Defendants against the informants in New Jersey state court, as a judgment had not been rendered nor had the case been raised during proffer sessions; that Defendants have not and cannot show that Special Agent Harris knew about the informants' alleged attempt to extort $500,000 from Defendants to drop the lawsuit and return the "stolen" records; and finally that CI#1's alleged substance abuse was unknown to the agent because it was never disclosed in the initial meetings with prosecutors prior to the issuance of the search warrants.[5]  Moreover, the Government argues that Agent Harris did not

---

[5] At the hearing on March 4, 2022, the parties discussed whether Special Agent Harris should have provided information on CI#1's criminal history. The record is unclear as to whether the agent had run the criminal history or whether the defense is critical of him for failing to do so. Regardless, that record reflects only an arrest, and no conviction for any crime.

know that the documents were "stolen" as a backup plan to protect the informants' interests.[6]  *Id.* at 15.  Gov. Resp. at 15-16.

To a great extent, this motion is grounded in a defense theory that in some respect Individual A, the informants' father, lurks in the background of this investigation, covertly directing the confidential informants to serve as government informants and perhaps consulting with the government himself.  During oral argument, defense counsel went so far as to suggest that perhaps there is a *sub rosa* channel of communication between Individual A and federal prosecutors in New Jersey.  To that end, the defense seeks an evidentiary hearing and the right to issue subpoenas to explore the contours of the Government's investigation.  Having considered the affidavit of Attorney Hall and having reviewed the interview notes of the case agent, I have been given no reason to doubt the representations of the prosecuting attorneys, who were present at the proffer sessions, specifically:  that there has been no direct contact between the Government and Individual A, that any communication has been through counsel, and that such communications largely manifested Individual A's unwillingness to extend assistance.  Based upon that review and conclusion, I focus now on what it can reasonably be said was within the knowledge of the case agent at the time the affidavit was submitted for the search warrants.

The Government concedes that Agent Harris had knowledge as five of the alleged omissions at the time that he affirmed the affidavit: (1) the informants were related to the Defendants; (2) their father was involved in civil litigation against the Defendants; (3) the informants were paid in cash; (4) the informants had secured immunity requests from the prosecution in exchange for the information they had been provided; and (5) one of the informants had been fired from Tony Luke's

---

[6] The Government notes that the only mention of the informants' taking the data as a "backup plan" occurs in grand jury testimony that took place more than two years after the search warrant was issued.  Gov. Resp. at 15.

in April 2016.  The Government clarifies that with respect to the fourth point, the informants did not have immunity against prosecution at the time of the search warrant affidavit.  Instead, they had proffer protection and derivative use immunity for any felony that prohibited the Government from using their statements against them. And with respect to the fifth point, although one informant was fired for taking POS data, the second informant left Tony Luke's on his own accord.  Gov. Resp. at 14.

Although it would have been best practice for the Special Agent to disclose some of the omitted information, specifically that the informants were related to Defendants and were engaged in a business dispute, as this has potential bearing on the informants' motive and credibility, I cannot conclude that the agent acted recklessly.  "[A] police officer cannot be expected to present a judge with complete background."  *Wilson*, 212 F.3d at 788.  The cases where recklessness has been found have involved far more meaningful omissions.  For example, in *United States v. Glover*, 755 F.3d 811, 814 (7th Cir. 2014), the Court found recklessness where the affidavit omitted substantial available information about the informant's extensive criminal history, including that he  "had been an informant for the Chicago police for six years[,]" "had been affiliated with a gang[,], "had fourteen criminal convictions[.] and had "o]n two prior occasions, ... used aliases when questioned by police officers[,]" and "had also received payment for providing information to the police in the past." 755 F.3d at 818.  Similarly, in *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993), the court concluded that the officer acted with reckless disregard when he told the magistrate that a drug sniffing dog showed "interest" in a package without disclosing that the dog had not gone into "full alert," a factor critical to determining whether there was probable cause to open the package.

Moreover, the agent here provided significant details bearing upon the informants' credibility that buffers the omissions.  He revealed that the informants worked in the business since their teenage years, one since age eleven or twelve, which strongly implies a family connection. Search Warrant

Aff. ¶¶ 8-10.   He discussed in detail their extensive involvement with the business, showing their close contact with the Defendants, and their acknowledged culpability in the criminal conduct.   *Id.* ¶¶ 11-13.   He also disclosed the existence of litigation between Individual A and the Defendants, and that Individual A had been fired.   *Id.* ¶11 n. 2.   Looking at the affidavit in its entirety, I cannot conclude that the omissions acknowledged by the Government show a reckless disregard for the truth.

     *C.   Probable Cause would have existed even if the omitted information had been supplied*

     Assuming for the sake of discussion that Agent Harris omitted details from the affidavit in reckless disregard for the truth, Defendants still must show that the omissions were "material, or necessary, to the probable cause determination."   *Wilson*, 212 F.3d at 789.   In such a case, the court must reconstruct the original affidavit by first "excis[ing] offending inaccuracies and insert[ing] the facts **recklessly** omitted, and then determin[ing] whether or not the 'corrected' warrant affidavit would establish probable cause" and thus whether the omitted facts were material.   *Id.*   Probable cause exists so long as there is a "fair probability" that the person committed the crime at issue. *Wilson*, 212 F.3d at 789 (citations omitted).

     The Defendants maintain that had the Magistrate Judge been aware that the informants were related to the Defendants and had more information about the family discord and civil litigation, she would not have made a finding as to probable cause.   In Defendants' view, the affidavit "misleadingly portrayed [the informants] as disinterested former employees who had learned of the alleged crimes while working at Tony Luke's" instead of as individuals with "a strong motive to implicate Defendants in a crime" which is relevant because the "informant's credibility or potential bias is [a] crucial [issue]," *Glover*, 755 F.3d at 816 (7th Cir. 2014).   Defs.' Mot. at 12-13.

     Given that the probable cause standard does not require a certainty but instead a "reasonable probability," none of the omitted facts would have changed the calculus as to the fair probability that

Defendants were perpetuating a tax fraud scheme.  For instance, as the Government rightly points out, had the affidavit contained information that the informants were related to Defendants and that the family dispute had resulted in civil litigation, this would have "cut both ways."  Gov. Resp. at 22.  Although knowledge as to family discord may have potentially cast doubt on the informants' motive, those same family ties make it "highly unlikely [that] two grandchildren/nephews would concoct an entire story about tax fraud being perpetrated at Tony Luke's over a decade" and then fabricate documents to implicate their own family members.  *Id.*  As to the omission that one of the informants had been fired, the weight of that omission seems trivial in view of the other known facts.  And although the affidavit did not specify that the informants themselves were paid in cash, such detail does not appear highly relevant where the affidavit made it unambiguously clear that the informants had participated in the tax fraud scheme.  Search Warrant Aff. at ¶¶ 6-7.  Finally, although the agent did not discuss the provision of limited immunity, it would be extraordinarily rare for informants to provide information without some degree of protection extended in return.

Even if the affidavit was supplemented by the omitted information, the probable cause calculus would not change. A magistrate judge would have been faced with the same facts, i.e., informants—albeit family members—who had worked for decades at Tony Luke's provided firsthand and detailed accounts as to the existence of a tax fraud scheme, in which they implicated themselves, with supporting source documents and spreadsheets.  And the agent was able to represent that the IRS records of the returns as filed were inconsistent with the records supplied by the informants. Any concern a magistrate judge might have had as to the informants' motive would have been far outweighed by the fair probability that the Defendants had committed the crimes alleged.

II.    Agent Harris corroborated the information he received from informants

Defendants further argue that evidence from the search should be suppressed because the government did not conduct sufficient investigation to corroborate the information provided by the

informants prior to applying for the warrants.   Defs.' Mot. at 14.   "When the police receive information from an informant for the first time, they have a duty to independently corroborate at least some of the information the informant provides." *United States v. Nasir,* 17 F. 4th 459, 466 (3d. Cir. 2021) (citing *Gates*, 462 U.S. at 242 ("[A]n officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.") (cleaned up)).

Given the totality of the circumstances known to the Agent at the time of the swearing of the probable cause affidavit, there was certainly probable cause, reasonably corroborated, for the search and seizure of evidence related to a tax fraud scheme.   Informants with firsthand knowledge and years of experience working at Tony Luke's provided richly detailed and consistent accounts of the Defendants' tax fraud scheme.   The specificity of the information they provided demonstrated that they had "inside information" and a "special familiarity with the [Defendants'] affairs." *Alabama v. White*, 496 U.S. 325, 332 (1990).   Not only did the informants' accounts corroborate each other, but their accounts could be compared with the documents they provided. And finally, a seasoned IRS agent with more than a decade of experience conducting or being involved in financial investigations related to tax crimes and evaluating tax returns and conducting audits of small businesses, Search Warrant Affidavit ¶¶2-3, was able to compare the documents provided by informants against Defendants' IRS tax returns, which provided concrete evidence as to a decades-long tax fraud scheme.[7]

---

[7] The Defendants cite *United States v. Loy*, 191 F.3d 360, 366 (3d Cir. 1999) for the proposition that an agent's "experience and expertise, without more, is insufficient to establish probable cause." There, the Court found that the inspector's conclusory statement that, based on his experience, those who collect pornographic materials involving minors commonly maintain that material in their homes, was not sufficient to establish probable cause that the defendant stored child pornography in his home. Here, in contrast, the agent had specific facts as to the existence of a tax fraud scheme that was operated from the back offices of Tony Luke's from informants who worked there and had documents that corroborated the existence of such a scheme.

The affidavit also references a cell phone video taken by one of the informants and allegedly depicting a Tony

Defendants rely heavily upon *United States v. Nasir*, 17 F. 4th at 466 and *United States v. Stearn*, 597 F.3d 540 (3d Cir. 2010), where the government received verbal information and tips from one confidential informant which required corroboration.  It bears emphasis that in those cases, the nature of the offenses were different.   In the investigation of "street crimes," such as those discussed in *Nasir* and *Stearn*, there are many crosscurrents and different sources of evidence.  In a tax fraud case like this one, allegations by an informant have an anchor under the exclusive control of the Government – the returns filed by the taxpayer accused of fraud.  Indeed, the central question in the case is whether there is a significant discrepancy between the returns filed and the payroll ledgers.  Here, individuals in a position to know about the company's tax evasion came forward with such records.  Their accounts were consistent, and the records they produced showed discrepancies consistent with fraud.

Keeping in mind that probable cause must be evaluated in light of the totality of the circumstances, it is highly significant that the informants made statements against their penal interest. *United States v. Patayan Soriano* 361 F.3d 494, 505-06 (9th Cir. 2004) (citing *United States v. Bishop,* 264 F.3d 919, 925 (9th Cir. 2001).   *Accord, United States v. Davis,* 617 F.2d 677, 693 (D.C.Cir.1979) (an admitted criminal participant has a strong incentive to tell the truth because "should he lie to the police," he "risks disfavor with the prosecution"), cert. denied, 445 U.S. 967 (1980); *cf. United States v. Salazar,* 945 F.2d 47, 50–51 (2d Cir. 1991) ("Though the informant ...

---

Luke's employee endorsing his check back to the company and receiving an envelope of cash in return. Ex. C. to Lee Decl. (Search Warrant Aff.) ¶12.  The Defendants point out that the "video could not provide any corroboration, much less substantial corroboration, as it appears to show nothing more than an employee receiving his paycheck in cash as opposed to check, which is not illegal." Def's Brief at 15.  However, a video that corroborates the informants' testimony as to how the tax fraud scheme was perpetuated does constitute corroborative evidence. And moreover, as the Supreme Court reasoned, "innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983).

had not previously been relied on ..., a face-to-face informant must ... be thought more reliable than an anonymous ... tipster [because] the former runs the greater risk that he may be held accountable if his information proves false.")

Finally, although the Defendants argue that the informants "had every reason to stretch the truth in order to serve their own personal interests and the interests of their father," Defs.' Mot. at 19, as reflected by the cases cited above it defies reason to conclude that they would lightly run the risk of providing false information. False statements or material admissions made during a proffer may be prosecuted under 18 U.S.C. § 1001, and the proffer letter here extended the customary warnings.  Proffer/Immunity Letter at 2.  As such, the informants were not incentivized to lie but were instead incentivized to tell the truth, both because they could be prosecuted for lying, and because any immunity they received was limited.

Finally, I reject Defendants' argument that the Government could easily have done more to corroborate the information that it received via the informants.  The suggestion that the investigators could have interviewed employees about the cash payroll, Defs.' Mot. at 15, or interviewed other witnesses, could easily have led to the spoliation and destruction of evidence. The core evidence existed on paper or in electronic data, and cash is difficult to trace.  Any awareness of the existence of an investigation could quickly have led to the removal, alteration, or destruction of evidence.

Because the information provided by informants was reasonably corroborated, the warrant was properly issued.

III.    The informants were not acting as government agents when they "stole" sales and payroll information and, therefore, any information as to that documentation in the affidavit shall not be suppressed

Defendants also advance a series of arguments as to why the Government should not have been permitted to rely upon the sales and payroll documents provided by the informants, rooted in

the theory that that the informants were acting as government agents when they took the documents from Tony Luke's in 2016.  See Defs.' Reply Br. at 22-26.[8]

The Fourth Amendment protects against unreasonable searches and seizures by government officials and private individuals acting as "instrument[s] or agent[s]" of the government, *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971), but is "wholly inapplicable" to a search or seizure conducted by private individuals acting in their private capacity.  *United States v. Jacobson*, 466 U.S. 109, 113 (1984).  There is no evidence that the informants were acting as government agents when they took financial documents from Tony Luke's in 2016.  The sworn declaration from the informants' lawyer specifically represents that the informants did not meet with the lawyer until *after* they had taken the documents from Tony Luke's, and it was another three months before the informants—with the assistance of their lawyer—contacted the U.S. Attorney's office.  Hall Decl. ¶¶1-6.

Defendants argue that "the Government's active encouragement of whistleblowing is sufficient to show Government knowledge or acquiescence in the search."  Defs.' Reply Br. at 12.  But regulatory legislation meant to encourage and protect whistleblowers who report illegal activity to federal agents does not on its own transform individual actors into government agents when they make independent decisions to report crimes to the IRS.  In *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614-15 (1989), the Court reasoned that the determination as to whether a private party acts as an instrument or agent of the government turns on "the degree of the Government's participation in the private party's activities."  It concluded that private railroads acted as agents of

---

[8] These arguments include that (1) the Government should not have been permitted to rely on the stolen sales and payroll information to establish probable cause for the warrants; (2) Defendants have standing to assert this claim, given that they either owned the property where the records were located or had a privacy interest in the documents; (3) the government's warrantless review of the sales and payroll information is not excused by the private search doctrine; and (4) the court should find a Fourth Amendment violation based on a trespass theory.  *See* Defs. Mot. at 19-27.

the government by participating in a regulatory scheme that authorized railroads to conduct drug and alcohol testing, which employees could not decline, and the results of which the government was entitled to receive. *Id.* at 614-15. Such an ongoing program is far different from an individual who, on their own initiative, goes to the government with incriminating information on the basis of potential incentives or legal protections.

Although the Third Circuit has not defined the degree of government involvement required in a search to find that an individual was acting as a government agent, other circuit courts have identified two primary factors that should be considered:

1) Whether the government knew of and acquiesced in a private search; and

2) Whether the private individual intended to assist law enforcement or had some other independent motivation.

*United States v. Jarrett*, 338 F.3d 339, 344-45 (4th Cir. 2003); *accord United States v. Paige*, 136 F.3d 1012, 1017-18 (5th Cir. 1998); *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987); *United States v. Walther*, 652 F.2d 788, 791-92 (9th Cir. 1981).[9]

Because there is no evidence indicating that the Government "affirmatively encourage[d], initiate[d] or instigate[d] the private action," Defendant's claims fail. *Jarrett*, 338 F.3d at 345 (citations omitted).

---

[9] Defendants argue that *United States v. Walther* supports the Defendants position as the court there found that an airline employee was acting as a government agent when he opened a passenger's luggage, discovered a white powder substance, and turned it over to the Drug Enforcement Agency, which later confirmed it to be cocaine. Defendants cite the Ninth Circuit's reasoning that even though "the DEA had no prior knowledge that this particular search would be conducted and had not directly encouraged [the employee] to search th[e] overnight case," the government nonetheless "acquiesce[d] in the search" because, *inter alia*, the only reason the employee opened the luggage was because he suspected it contained drugs and he expected a likely reward from the DEA in exchange for reporting the crime. Defs.' Reply Br. at 13 citing *Walther*, 652 F.2d at 792-93. In *Walther*, however, the Court emphasized the informant's prior experience working with the DEA, concluding that his previously receiving rewards for providing drug-related information, "provides proof of the government's acquiescence in the search." *Id.* at 793. In this case, there is no evidence that Government agents had personally encouraged the informants to serve as whistleblowers before they decided to take documents from Tony Luke's in 2016.

IV.     The affidavit established probable cause for the Government to seize records between 2006 and
        present

It is well established that "a magistrate may not issue a warrant authorizing a search and seizure which exceeds the ambit of the probable cause showing made to him." *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982).  If a warrant is issued in such a situation, it is invalid under the Fourth Amendment for being overly broad.  *See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents* ($92,422.57), 307 F.3d 137, 149 (3d Cir. 2002) ("An overly broad warrant 'describe[s] in both specific and inclusive generic terms what is to be seized,' but it authorizes the seizure of items as to which there is no probable cause.") (quoting *Christine*, 687 F.2d at 753-54).

Defendants argue that because the affidavit in support of the warrant applications only asserted that the IRS agent had probable cause to believe that defendants have "filed false employment, corporate and personal income tax returns. . . for the years 2012 through 2015[,]" Def. Mot. at 28 Search Warrant Aff. at ¶5, it was a violation of the Fourth Amendment that the warrant allowed the government to seize records—which the government did in fact seize—outside of that time period.  *Id.*

Defendants place too much weight upon a single paragraph of the affidavit.  As the government rightly points out, the affidavit established probable cause for tax crimes between 2006 and 2015, supporting seizure of records within that timeframe.  Although in one place the affidavit specifically stated that the IRS had probable cause to believe that defendants filed false tax returns between 2012 and 2015, the affidavit also contains a discussion of the confidential informants' claim that the tax scheme dated back to 2006, and a table by tax year which compared the total payroll based on records produced by CI#2 to the total payroll recorded on the filed tax returns dating back

to 2006, which show a significant difference in what was paid versus what was reported.  *See* Search Warrant Aff. ¶¶15, 16.  The affidavit also contains a discussion of the tax fraud scheme which Agent Harris determined "has been going on for at least a decade," *id.* ¶26, as evidenced by 1) Point of Sale "Profit Center Reports" showing true sales for 2013 and 2014; and 2) internal books and records created at Tony Luke's showing true sales beginning in 2006 which Agent Harris compared with filed returns and showed underreporting to the IRS in the amount of $12,115.076 for 2006, 2008, 2009, 2011, 2013, 2014, and 2015, *id.* ¶¶24-26.  Although defense counsel correctly observed during oral argument that not all years between 2006 and present were accounted for in the data provided by the confidential informants, the data included in the affidavit nonetheless establishes that the government had probable cause dating back to 2006, and thus, the search and seizure did not violate Defendants' Fourth Amendment rights.

V.   <u>Although the warrant did not define the cash to be seized with particularity, the unincorporated affidavit cures the overly broad warrant because the actual search was restricted to the narrower scope of the affidavit.</u>

In addition to being supported by probable cause, a warrant must also "particularly describ[e] the place to be searched, and the persons or things to be seized.  *Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d at 148.  As laid out by the Supreme Court in *Groh v. Ramirez,* "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents... A court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." 540 U.S. 551, 557-58 (2004); *see also U.S. v. Tracey*, 597 F.3d 140, 143, 146 (3d Cir. 2010) (reasoning that "an affidavit may be used in determining the scope of a warrant that lacks particularity if the warrant is 'accompanied by an affidavit that is incorporated by reference.'") (citing *United States v. Johnson*, 690 F.2d 60, 64 (3d Cir. 1982)).

I agree with Defendants that that the warrants fail to satisfy the particularity requirement, and are overbroad, insofar as they authorized the seizure of "all cash" at the subject locations. Defs.' Mot. at 29-30 citing Search Warrant Aff. Attachments (Attachment B to 1701-1707 South 4th St. warrant) ¶1(c); ex. B to Lee Decl. (Attachment B to 39 East Oregon Ave. warrant) ¶ 1(c)). "All cash" is an overly broad description because it contains no limitation on which cash could be seized nor provided details as to how "all cash" at Tony Luke's and Tony Luke's Commissary was connected with criminal activity, especially given that the company legitimately sells food that customers pay for in cash. *See U.S. v. Wecht*, 619 F. Supp. 2d 213, 248 (W.D. Pa. 2009) (citing *United States v. Know*, 58 F.3d 423, 427 (9th Cir. 1995) ("warrant authorizing the seizure of virtually every document and computer file at the target company was insufficiently particular where it 'contained no limitations on which documents within each category could be seized or suggested how they related to specific criminal activity.'").)

Moreover, because Agent Harris' search warrant affidavit was neither attached to nor appropriately incorporated in the warrant, the warrant may not be construed in light of an accompanying affidavit unless an exception applies. *See Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004) (referencing *Johnson,* 690 F.2d 60, 64–65 (3d Cir. 1982) (reasoning that "it is perfectly appropriate to construe a warrant in light of an accompanying affidavit or other document that is incorporated within the warrant. But to take advantage of this principle of interpretation, the warrant must expressly incorporate the affidavit."). The warrant here did not expressly incorporate the affidavit, because it did not have clear language such as "the annexed affidavit. . . is incorporated herein by reference." *Johnson*, 690 F.2d at 64.

Nonetheless, "an unincorporated affidavit has been read to modify a search warrant...in which the affidavit is particularized but the warrant is overbroad." *Groody*, 361 F.3d at 240. "So long as the actual search is confined to the *narrower* scope of the affidavit, courts have sometimes allowed

the unincorporated affidavit to 'cure' the warrant, or at least have treated excessive elements of the warrant as harmless surplusage." *Id.* (citing *United States v. Stefonek*, 179 F.3d 1030, 1033-34 (7th Cir. 1999)). That is precisely the situation that we have here. The unincorporated affidavit makes specific reference to the cash to be seized, specifically "cash in a large six-foot tall safe in Nicholas Lucidonio's office [which] CI#2 believed.... held approximately $100,000 to $140,000 in cash at times." Search Warrant Aff. ¶23. Defendants correctly note that the reference to cash in the safe is set forth in the section of the affidavit titled "The Income Tax Fraud Scheme," rather than in the section titled "Evidence Located at the Places to be Searched." But the section of the affidavit with respect to the location of the search specifies "secure locations within [the company's] business and residence," Search Warrant Aff. at 14, ¶32b, and the cash seized was taken from safes and a desk, rather than operating tills. Moreover, because I have concluded that the affidavit established probable cause as to a tax fraud scheme dating back to 2006, Defendant's argument that it was illegal to seize cash outside of the years 2012 to 2015 also fails.

*U.S. v. Tracey* also supports the proposition that "an unincorporated affidavit can cure an overly broad warrant if the actual search is restricted to the narrower scope of the affidavit." 597 F.3d at 149. In *Tracey,* the Third Circuit discussed the reasoning in *Groody*, and "emphasized the distinction between allowing an unincorporated affidavit to broaden, rather than limit, the scope of the search permitted by the warrant." 597 F.3d at 149 (citing *Groody*, 361 F.3d at 240). Given that the affidavit here is *limiting* the scope of the search of the cash, as opposed to broadening it, the unincorporated affidavit can modify and cure the search warrant.

The approach I follow here also finds support in *U.S. v. Christine*, 687 F.2d at 753. There, the Court of Appeals reasoned that a district court had properly approached an overbroad warrant by "measuring the scope and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant issued." Applying this principle to the facts at

issue here, the scope and seizure authorized by the warrant was appropriate because the affidavit included that cash in the amount of $100,000 to $140,000 was held in a safe box, and that currency would be held in "secure locations," as articulated by informants who had years of experience working in the company.

The Defendants argue that the unincorporated affidavit cannot cure the search warrant, because an unincorporated affidavit can only cure an "overly broad warrant" as opposed to a general warrant. Defs.' Reply Br. at 17. This argument is based on the premise that the warrant here is a general warrant. Such is not the case. As noted in *United States v. Wecht*, 619 F.Supp 2d 213, 232 (W.D. Pa. 2009):

> [t]here is a legal distinction between a general warrant, which is invalid because it vests the 'executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's] papers in search of criminal evidence,' and an overly broad warrant, which 'describe[s] in both specific and inclusive general terms what is to be seized,' but 'authorizes the seizure of items as to which there is no probable cause.'"

*United States v. Yusuf*, 461 F.3d 374, 393 n. 19 (3d Cir. 2006) (citations omitted). *See also U.S. v. Christine,* 687 F.2d at 753.

The warrant here did not authorize "a general exploratory rummaging in a person's belongings." *Christine*, 687 F.2d 749, 752 (citations omitted). There, the Court reasoned that a "warrant's clauses describe[d] in both specific and inclusive generic terms what is to be seized: 'all folders...all checks...all general ledgers (and) all correspondence...'" and "[b]y directing the searching officers to seize all of these items, the magistrate, rather than the officer, determined what was to be seized." *Id.* at 753. Here, as in *Christine*, the magistrate—and not the officer—determined what was to be seized. For these reasons and those above, I hold that the unincorporated affidavit cures the overly broad warrant, and the cash seized will not be suppressed.

**IV.**     **Conclusion**

For the reasons set forth above, Defendants' Motion to Suppress the March 15, 2017 search warrants and any evidence derived therefrom was denied by this Court's order of March 9. 2022, ECF 61.


    /s/ Gerald Austin McHugh
United States District Judge