IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NO.  20-211 |
| : | |
| ANTHONY LUCIDONIO, SR. and : | |
| NICHOLAS LUCIDONIO : | |

McHUGH, J.                                                                                 October 24, 2023

## MEMORANDUM

      This case arises out of a prosecution for tax fraud committed by two of the owners of a family business.  Defendants Anthony Lucidonio, Sr., and Nicholas Lucidonio both pleaded guilty to Count One of the Indictment, charging them with conspiracy to defraud the United States under l8 U.S.C. § 371, arising from their participation in a tax fraud scheme between 2006 and 2016 to conceal Tony Luke's sales and receipts and evade payroll taxes.  Both the Government and the defense seek adjustments to portions of the Presentence Investigation Report, raising multiple issues that need to be resolved in advance of sentencing.[1]

**1) Disputes as to the amount of tax loss**

      The Government bears the burden of proving the amount of tax loss by a preponderance of the evidence.  *See United States v. Ali,* 508 F.3d 136, 145 (3d Cir. 2007); *United States v. Lacerda,* 958 F.3d 196, 214 (3d Cir. 2020) ("The government bears the initial burden of proving loss by a preponderance of the evidence.").  The calculation does not need to be exact but must be a "reasonable estimate based on the available facts." *United States v. Gricco*, 277 F.3d 339, 356 (3d Cir. 2002); *see also* Application Note 1 to U.S.S.G. § 2T1.1 ("In some instances, such as when

---

[1] The Government has submitted 3 appendices some 1440 pages in length (ECF 91).  The defense has supplemented that with unpaginated exhibits some seven inches in height.  References to the Government's exhibits are herein marked "A0."

indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts.").

A defendant may then seek to reduce the tax loss by asserting additional unclaimed credits, deductions, or exemptions, but only if they are reasonably ascertainable. Application Note 3 to U.S.S.G. § 2T1.1. As to such reductions, defendant bears the burden, also by a preponderance of the evidence. *Id.*; *United States v. Desu,* 23 F.4th 224, 237-38 (3d Cir. 2022).

    a. *Relevant conduct and Nicholas' capacity*

Under the rubric of "relevant conduct," the Government seeks to include in the estimated tax loss the loss of income taxes resulting from the payroll tax evasion, which could, depending upon the amount, result in a Base Offense Level of 20 under the Sentencing Guidelines. Defendants respond that income tax loss is not properly considered because they did not plead guilty to income tax evasion. Defendants are correct that their pleas to conspiracy do not specifically admit to income tax evasion. Each provides:

> The defendant agrees to plead guilty to Count One of the Indictment, charging him with conspiracy to defraud the United States, in violation of 18 U.S.C. Section 371, arising from the defendant's participation in a tax fraud scheme between 2006 and 2016 to conceal Tony Luke's sales and receipts, and evade payroll taxes.

ECF 70 ¶ 1; ECF 71¶ 1. They are also correct that the factual recitation in the Government's Change of Plea Memorandum does not address evidence of tax evasion. ECF 69. But that does not end the inquiry.

Count One of the Indictment defined the conspiracy broadly as including both payroll and income tax fraud, ECF 1 at 1-10, and both defendants pleaded guilty to conspiracy. This leads the Government to argue that even if income tax fraud was not a count of conviction, it was still "relevant conduct" that can factor into determining the base offense level. U.S.S.G. Section 1B1.3(a) defines relevant conduct as:

2

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
> > (i) within the scope of the jointly undertaken criminal activity,
> > (ii) in furtherance of that criminal activity, and
> > (iii) reasonably foreseeable in connection with that criminal activity;
> > . . .
> (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions[.]

The Guidelines applicable to tax offenses, specifically Application Note 2 to U.S.S.G. Section 2T1.1 provides:

> In determining the total tax loss attributable to the offense (see §1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated. The following examples are illustrative of conduct that is part of the same course of conduct or common scheme or plan: (A) there is a continuing pattern of violations of the tax laws by the defendant . . . (C) the violations involve the same or a related series of transactions . . . . These examples are not intended to be exhaustive.

In response, both Defendants argue that the offense level should be calculated based solely upon the payroll tax scheme. Nicholas Lucidonio further argues that, at most, he had agreed to participate in a conspiracy to evade payroll taxes and cannot be found to have any broader involvement. He contends that after the Court has conducted "a searching and individualized inquiry into the circumstances" of his involvement, *United States v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992), it will find no basis proper for considering income tax evasion in sentencing him. He supports this argument with a report from a licensed psychologist, Steven Samuel Ph.D., opining that Nicholas has intellectual functioning in the borderline range, especially as to mathematical skills and multi-tasking. Dr. Samuel does not presume to say that Mr. Lucidonio lacked the mental capacity to

3

participate in a tax evasion scheme but provides counsel with data points from which to forge such an argument.

As to Anthony Lucidonio, Sr. he advances no persuasive argument that would relieve him of responsibility for income tax evasion.[2] Necessarily, the money diverted from the payroll tax scheme increased the overall revenue of the business, which flowed directly back to him. As to Nicholas, I conclude that whatever deficits Dr. Samuel found by testing do not appear to have undermined his ability to conduct the affairs of the business.

Turning to the evidentiary basis for Nicholas' involvement, the two confidential informants who sparked the investigation were certainly in a position to describe the central role that he played. Their accounts were, in turn, corroborated by the statements and testimony of other employees. Nicholas Lucidonio was the day-to-day operations supervisor to whom employees reported. A0428; A0858; A0860; A0390. He controlled and processed cash on a daily basis. A0859; A1021; A0917; *accord* A0429-30; A0389-92. Nicholas either picked up the cash from the drawer, and the POS/register[3] tapes and cash, or had them delivered to him by a long-time employee. *Id*.; *see also* A0419-21.

Nicholas Lucidonio also directed CI#2 to input the true sales figures into the Ledgers based on the POS tapes, A0389-92; A1011, and kept a true and accurate accounting of sales on a USB flash drive, while directing the destruction of the POS register tapes. A0391-92; A1018. The business' accountant has attested that he would have preferred accurate records and ledgers from which to prepare tax returns. A0478-80. Nicholas placed or had others place the cash from sales into two safes at the Commissary which he controlled. A0392; A1011; A1016; A1019. From there he would

---

[2] Anthony Lucidonio has not challenged the Probation Officer's assessment of a two-point upward adjustment for a leadership role under U.S.S.G. Section 3B1.1(c).

[3] The abbreviation POS refers to "point of sale."

4

make or direct the deposits of cash to the business accounts, A0437, A0392-94. Such deposits did not include all sales receipts, but only a portion of the sales in order to cover bills. A0392-93; *see also* A0001-37 (Ledgers showing all sales).

Of particular significance, while directing the preparation of Ledgers showing true sales, it was defendant Nicholas Lucidonio that prepared a second, fraudulent ledger to give to accountants. A0518 (fraudulent ledger); A0451-457 (accountant testimony). This second ledger recorded only deposits into the business accounts, which omitted the skimmed cash. *Id.* In similar fashion, on a weekly basis Nicholas faxed or called into the accountant a number for employee hours that dramatically understated the true hours employees worked. A0647-48 (fraudulent hours, faxed); A0489-93 (accountant testimony); A0799 (payroll clerk). Because of that, Nicholas caused paychecks to be issued, and taxes withheld, on only a portion of each employee's true wages. CI#2 was instructed to keep an electronic accounting of true hours and wages, and to destroy the timecards. A0394-402. Nicholas then directed that additional cash be placed in envelopes for employees, envelopes that he delivered, or directed a driver to deliver, to the store for distribution to employees. *Id.*; A0429; A0858-59; A0915-16. He was heard to say that he did not want to pay overtime hours and rates because otherwise they would get "killed" on taxes. A0410; A1009-10 ¶¶ 6-7, 9. This practice of getting paid "under the table" was confirmed by other employees. A0858-59; A0916-17; A0920.

Around tax time, together with his father, Nicholas met with the accountant to go over the corporate and individual tax returns. A0451-459, 471-73, 477. Although defendant Anthony Lucidonio Sr., is 90 percent owner of the business, and signed the false corporate tax returns, Nicholas was present while the accountant reviewed the returns. *See* A0451-459, 471-73, 477. And when there were had any questions during preparation, the accountant or his assistants would call Nicholas. A0458-59, 471.

Given this record, it defies belief to say that Nicholas lacked the mental capacity to understand that this systemic and substantial underreporting of payroll taxes and diversion of funds also served to increase the net revenue of the business flowing back to him and his father.

Relatedly, Defendants argue that a reasonable doubt standard should apply to the alleged income tax fraud, because they were not convicted of that offense, relying on *United States v. Jett*, 982 F.3d 1072, 1078 (7th Cir. 2020). But the mere fact that certain conduct could give rise to a separate criminal charge does not preclude consideration of such facts if such conduct is relevant under the Sentencing Guidelines.

> Facts relevant to application of the Guidelines—whether or not they constitute a "separate offense"—do not have this effect [of increasing the maximum punishment to which the defendant is exposed]. They inform the district court's discretion without limiting its authority. They therefore do not constitute "elements" of a "crime" under the rationale of *Apprendi* and do not implicate the rights to a jury trial and proof beyond a reasonable doubt.

*United States v. Grier*, 475 F.3d 556, 567-68 (3d Cir. 2007) (internal citations omitted). I will therefore consider the income tax evasion as falling within the scope of relevant conduct for purposes of sentencing.

   b. *Payroll and income tax loss calculations*

With respect to the baseline offense level, based upon the Government's submissions, the Probation Office has calculated a base offense level of 20, based on payroll tax loss of $486,142.70 and income tax loss of $834,900.61, totaling $1,321,043.31. The payroll tax losses represent unpaid taxes for Tony Luke Inc. and Tony Luke Commissary, Inc. for the years 2008, 2009, 2011, 2013, 2014, and 2015, and the income tax losses represent unpaid income taxes for Anthony Sr., Nicholas, and Anthony Jr. Lucidonio for the years 2008, 2009, 2011, 2013, and 2014. In assessing total tax loss, the relevant threshold for purposes of this case is $550,000, because tax losses of more than $550,000 result in a base offense level of 20 under U.S.S.G. § 2T4.1(H). The defense argues for a

lower calculation consisting of $286,000 in payroll tax losses and $234,175.64 in alleged income tax losses, based on an analysis from an accountant.

The Government's assessment of loss was performed by IRS Agent Paul J. Luca, set forth in the record at A1025-68 (Revenue Agent Paul J. Luca Decl. and Exhibits). Mr. Luca's methodology is clearly described and sensible. For payroll tax losses related to non-shareholder employees, he compared the number from the accurate ledgers obtained as part of the investigation with returns filed by the business. Those calculations yielded the amount that was under-reported, to which he then applied the applicable payroll taxes and a ten percent withholding rate. As to the Lucidonios, he applied the fifty percent rate of non-payment revealed by the investigation, and attributed additional income to both, after which he proceeded to perform calculations as to the applicable taxes and appropriate withholding rates.

To test the validity of the ten percent withholding rate he performed a series of calculations based upon historic payroll, which he also adjusted to reflect cash payments to employees, set forth in Exhibits F through I, A0 1054-56, to his Declaration.

As to income tax losses, Mr. Luca used ledger data, sales data, and tax records. He totaled the gross receipts not reported by Tony Luke, Inc. for the 2008, 2009, 2011, 2013, and 2014 tax years on their Form 1120S Corporate income tax returns and calculated the increase in net profits that would have flowed through S-corporation to their individual income tax returns. This in turn yielded the tax loss, as reflected by Exhibit J, A1067-68.

Defendants' expert accountant William Smith disputes the Government's calculations in two reports, contending that the payroll tax loss is $286,000, and income tax loss $234,175.64, below the $550,000 threshold required for a base offense level of 20. Mr. Smith arrives at the lower payroll tax loss by using a withholding rate of only two percent. I agree with the Government that this is unrealistic and not supported by the record. It should be noted that the ten percent rate employed by

7

the Government represented the lowest marginal tax rate applicable at the time, even though the Guidelines permit calculation based on a 28 percent rate. U.S.S.G. § 2T1(c)(1)(A). Mr. Smith arrived at the two percent rate by focusing on the returns of only five employees, and the taxpayers chosen had large families. His two percent rate is also inconsistent with the records of the business, in that Forms W-2 for 2013 and 2014 employees applicable to some 30 employees showed average withholding rates in excess of 10 percent for all employees, A1055-1065, which, the Government cogently observes, represents about half their earning because of the amount paid in cash. Mr. Smith also ignores higher paid individuals, including the Defendants themselves, and fails to account for the fact that inclusion of unreported income, which would at the time of filing have resulted in a higher amount due, bears upon the amount the employer should withhold.

Mr. Smith's conclusion also depends on the premise that the underreporting of wages at Tony Luke's Commissary was minimal and limited to two individuals. The factual basis for this analysis is based upon a letter from defense counsel asking him to accept their "understanding" that few Commissary employees were paid in cash. But CI#2 revealed that employees at the Commissary were paid in the same fashion as employees at the store, A0394-99, and the wages reported were unrealistically low for forty-hour work weeks. *See* A1062-66. The total for true wages reflected in Commissary records is consistent between all years, and though there is an anomaly in the higher unreported wages for 2013, that is consistent with the fact that Anthony Lucidonio reported no wages that year.

Having considered Mr. Smith's analysis, I am not persuaded by his critique of the Government's calculations of payroll tax losses and find that the Government has met its burden by a preponderance of the evidence.

With respect to income tax losses, the defense contends that it is entitled to additional expenses, deductions, and credits. As a threshold observation, the parties have been involved in

8

protracted negotiations, and I accept the Government's representation that it has already accepted adjustments of expenses totaling more than $4.25 million, including adjustments for tax collected; additional expenses not appearing on the tax returns they filed; the additional expenses related to the Tony Luke Commissary Ledger; additional cash payroll expenses that they did not report but now claim; and certain payouts from the register, despite the Government's view that these were already accounted for.  *See* A1068.

      c.  *Additional adjustments*

Defendants now seek four additional adjustments.  First, they seek an adjustment for sales tax for the years 2013 and 2014, because they voluntarily disclosed the underreporting to state authorities once it was identified.  But the record is clear that the disclosure was prompted by Defendants' fear of being caught once the true sales records for 2013 and 2014 were taken by CI#1 and CI#2.  I therefore reject such an adjustment, because U.S.S.G. Section 2T1.1(c)(5) mandates that "tax loss is not reduced by any payment of the tax subsequent to the commission of the offense."[4]

Second, Defendants further seek an adjustment of $208,114.79 in additional Tony Luke Ledger expenses for 2014 for taxes paid to the City.  The Government rejected this adjustment because, even though it accepted many other expenses as facially reasonable without documentary support, the expense in question was abnormally high for 2014.  It therefore requested verification of the number. Defendants bear the burden on this issue, and I can identify no documentation in the record to support this adjustment.  Consequently, I will reject it.

Third, Defendants seek an adjustment of more than $300,000 for complimentary meals that were purportedly included in gross receipts but for which no payment was received.  The

---

[4] The Government cites authority for the proposition that in fact, such losses to state authorities could be considered for purposes of sentencing here, *United States v. Schilling*, 142 F.3d 388, 394 (7th Cir.1998) (affirming sentence computed in part on unpaid state taxes), which, by the Government's estimate, would exceed $600,000.

Government opposes this reduction as against the evidence. D.T., long-time employee and store manager, advised investigators that to the extent employee meals were run through the POS system, the POS produced a ticket, which was then held by the cashier, who later entered the ticket for the meal into the POS system to "comp it out." A0861-62. This was corroborated by CI#2, who stated that even if meals were run through the POS, they were "seen out" and accounted for at the end of the day *via* print outs from the POS. A0426-27. If a disparity arose between the sales and the cash drawer, inquiry would be made to determine why the drawer was short. *Id.* Intuitively, these explanations make sense because in a cash business reconciling cash drawers to POS records is critical. It defies belief to assume that CI#2 and Nicholas would not have noticed such large amounts in missing cash without reconciling the sales records.

The defense asserts that "at some point during this period", a "comp" button was added to the register, but before that, including in 2013 and 2014, meals were not rung out. The Government is correct that there is no direct evidence of such a change. It appears that Mr. Smith identified a change in the way sales were recorded, and from that attributed some percentage of sales to complimentary meals, thereby the business' revenue. This approach suffers from two deficits. First, it is inconsistent with the information supplied by the employees. Second, Mr. Smith represents that his company "CIBZ applied a methodology consistent with later years' records," ECF 87 Ex. D at 22, but does not describe that methodology or the specific assumptions used. On balance, firsthand accounts of how the business operated carry more weight than retrospective adjustments by litigation experts. Thus, the Government's view of this proposed adjustment prevails.

Finally, as to other discounts for military and first responders, the defense lacks evidence to support this, and such discounts would have been included in the reconciliation done at day's end.

These highly specific arguments for further adjustments cannot be considered in a vacuum. It bears mention that the Government's calculations do not include loss from 2006, 2010, and 2012

due to a lack of records, even though it certainly incurred substantial losses during those years given the admitted conspiracy. Just as Mr. Smith purports to reconsider historical data, the Government could do so, as well, and thereby increase the amounts. In addition, the Government's calculations credited Defendants with more than $400,000 in sales tax deductions that defendants withheld but did not pay to the state and accepted $330,000 in "payout" deductions for 2008, 2009, and 2011 even though CI#2 stated he accounted for payouts at the register before recording the sales figures. *See* A1068. The Government's ultimate burden is to provide a "reasonable estimate" of the loss, and it is therefore proper to consider what it excluded from consideration to the benefit of the Defendants.

    d.  *Profitability analysis*

The defense advances a further theory which the Government contends it has raised for the first time, based upon net profit data from the restaurant industry. Specifically, Defendants attack the estimate of loss as unrealistic because it would imply a level of profitability that is unattainable. At first glance, this argument has a superficial appeal. But it fails on closer scrutiny, as Mr. Smith's analysis reaches inflated profit percentages by considering gross income without regard to the expenses and reductions recognized by the Government. The tables set forth in the Government's Reply Brief, ECF 99 at 17, present a more realistic picture of profitability, especially when the Commissary is considered as part of an integrated business enterprise with Tony Luke's, as Defendants argue it should be.

Mr. Smith asserts an average range of profitability of 4.46 percent for single unit restaurants without a liquor license, ranging as high as 7 percent for acclaimed restaurants. For three of the five years for which calculations were done, the ultimate rate of profit, taking into account the Government's adjustments, was in the range of 7 percent, with the others at 10.9 and 16.6. Such deviations from the norm do not exceed the bounds of reason. First, as the Government observes, by definition, averages are a function of all ranges of performance from high to low. Tony Luke's

is an acclaimed brand that occupies a niche position with limited fixed costs doing a high volume of business. I also accept the Government's argument that net profitability would be increased precisely because of Defendants' wrongful conduct. As one example, CI#2 included 8 percent sales tax collected in the sales figures in the Ledger. In its calculations, the Government adjusted from sales the $326,923 in sales tax collected at a rate of 8 percent, which resulted in true gross sales of $3,759,620. *See* A1068. But the Ledgers show Defendants only paid over $156,297 in sales tax to the state, keeping the rest.

Mr. Smith's analysis is heavily dependent on the assumption that the Ledgers provided to the Government by the Confidential Informants cannot be trusted. The record refutes that. The Ledgers were kept by CI#2 at the direction of Nicholas Lucidonio and that Informant made entries on a daily basis. That is sufficient for purposes of reliability. *United States v. Smith*, 751 F.3d 107, 116 (3d Cir. 2014); *see also United States v. Paulino*, 996 F.2d 1541, 1548 (3d Cir.1993). CI#2's explanation of the Ledgers was corroborated by a second Informant, and both faced potential criminal liability if they lied to federal law enforcement officers. Importantly, evidence recovered from execution of the search warrant corroborated the accuracy of the Ledgers. POS records from 2013 and 2014 matched the copies provided by CI#1 and CI#2. The search also yielded, in hard copy form from a safe, a limited set of Tony Luke daily sales register reports for 2013 through 2016, which provided information for the Ledgers prepared by CI#2. Those reports matched the reports provided by CI#1 and CI#2 with no sign of alteration. Finally, Nicholas Lucidonio kept copies of the data over several years' time on a removable USB flash drive, locking it in a cabinet. A1018. Such conduct confirms the importance of the information.

The defense contends that the Ledgers do not reflect expenses paid in cash from sales proceeds. The record refutes that, as well. CI#2 reviewed the Ledgers and identified vendors who would have been paid partially in cash. With one exception, total expenses in the Ledgers exceed

12

the checks out of business bank accounts for those expenses, as reflected in Agent Luca's charts. A1407-1410.  And, as mentioned above, Defendants were given the benefit of the doubt as to $330,000 in "payout" deductions for 2008, 2009, and 2011, *see* A1068, even though CI#2 stated he accounted for payouts at the register before recording the sales figures.  Defendants were also credited with state sales tax collected and retained.

After a close review of the record, I find that the Government has met its burden by a preponderance of the evidence and established a tax loss of $1,321,043.31 as to both Defendants.

2) **Applicability of Guideline enhancement § 2T1.9(b)(2)**

Where defendants have pleaded guilty to a conspiracy charge under 18 U.S.C. §371, U.S.S.G. § 2T1.9(b)(2) provides a two-level upward adjustment:

> If the conduct was intended to encourage persons other than or in addition to co-conspirators to violate the internal revenue laws or impede, impair, obstruct, or defeat the ascertainment, computation, assessment, or collection of revenue[.]

Defendants vigorously object to application of this enhancement, raising multiple arguments. The first is textual.  Employing a variety of semantic devices, Defendants contend that the phrase "intend to encourage" requires explicit proof that defendants advised, verbally or in writing, that employees should not report their cash wages.  The structure and language of the text do not support such an understanding.  It refers to the defendant's "conduct," which can include but is hardly limited to speech.  And, though counsel cites some definitions for "encourage," recognized synonyms include "abet," "invite," "further," "approve" and "support."  It seems self-evident that creating and administering a cash payroll system that withholds less than federal law and requires and issues fraudulent W-2 forms to employees, is "intended to encourage" those employees to violate tax laws, as well.  Indeed, the scheme *depends* on it, as honest treatment of tax obligations by employees would rapidly expose the fraud.

To the extent that the Commentary is properly considered, the first Application Note makes clear that the enhancement should not be applied if the impact of the conspiracy does not extend beyond the taxpayers charged. But here, the conspiracy undermined the collection of taxes from all the employees whose wages were underreported. Application Note 4 gives two examples of conduct "intended to encourage" violation of the tax laws, but nothing suggests that this was intended as an exhaustive list. The Commission also provided "Background" for the adoption of the enhancement, stating that it was intended to target conspiracies involving substantial sums of money making it difficult to determine the extent of revenue loss, with the potential to "subvert the revenue system." In this case, the conspiracy to which Defendants pleaded guilty spanned ten years and involved systemic underreporting of wages for business with an average of 30 to 40 employees. The scheme involved the destruction of most original records and the maintenance of false ledgers making the loss challenging to estimate. I do not accept Defendants' characterization that this was a mere "byproduct" of their personal tax fraud. In my view, the accurate reporting and withholding of wages is fundamental to the revenue system, both to ensure accurate returns by employees and the financial ability to pay taxes when due. And the impact of a fraudulent withholding scheme does not just affect income tax, but also Social Security and Medicare, critically important social programs.

Defendants are correct that their employees separately had an obligation to report their wages. But realistically, by any measure, that would have required unusual effort on the part of hourly employees in keeping an accurate tally of wages, reserving sufficient cash to pay the taxes due, and filing a return accounting for a substantial portion of income that was unreported. Defendants clearly expected their employees to go along with the scheme, and the length of time for which it persisted confirms that they did. And I reject the argument that their acquiescence renders § 2T1.9(b)(2) inapplicable, because it is clearly intended to address violations of tax law by others not directly involved in the conspiracy.

There is a dearth of precedent applying § 2T1.9(b)(2) to a payroll tax scheme. The defense interprets this as supporting the conclusion that it does not apply. But the absence of caselaw is not necessarily illuminating. The reality is that the vast majority of sentences are imposed without a formal opinion as to the applicability of the controlling Guidelines, as evidenced by the fact that both sides here seek to attach great significance to the transcript of the sentencing hearing in *United States v. Zourdos,* No. 5:20-cr-00298 (N.D.N.Y., July 12, 2022). In practice, application of the Guidelines is a fact-specific exercise, where the district judge must make a series of nuanced judgments, and those judgments are affected by many variables. In the context of this case, for example, if the underreporting were confined to family members or occurred for a shorter period of time, there would be serious reason to question the applicability of the enhancement. But a company-wide practice over the course of a decade certainly fits the description of a scheme "to subvert the revenue system." As to Defendants' contention that the Government has not traditionally invoked the enhancement in payroll cases, even if true, such an exercise of prosecutorial discretion is not relevant to the legal question of the Guideline's applicability here.

Finally, assuming that "to encourage" requires some affirmative statement, the two Confidential Informants were instructed by Nicholas Lucidonio that they should "explain to employees that they (the employees) were earning more money and not paying taxes by being paid in this manner." A1009. And both Informants "understood the implications of the explanations they were providing to employees." *Id.*

### 3) Nicholas' request for minor role adjustment

Nicholas claims he should have a minor role adjustment under U.S.S.G Section 3B1.2, on the ground that his involvement was minimal compared to his father's. Application Note 3(A) provides:

> Likewise, a defendant who is accountable under §1B1.3 for a loss amount under §2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the defendant's

15

> personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline.

With respect to personal gain, Nicholas emphasizes that under the Government's calculation, he evaded at most $30,433.53 in income taxes, but it seeks to hold him accountable for more than $800,000 in alleged unpaid income taxes.

Ordinarily, this argument would carry some weight. It is not persuasive here for two reasons. The first is that, as reviewed above, Nicholas played a central role in running the payroll scheme on a daily basis. The conspiracy inflated the profits of the family business where he earned his living – a business he would presumably inherit at some future date – and his more limited financial benefit roughly corresponds with the division of ownership between him and his father.

Second, the major beneficiary of the scheme is Nicholas' *father*. Because providing for loved ones is an essential element of being human, when someone participates in fraud for the monetary benefit of a close family member, even if they do not reap all of the financial benefit, an important personal interest is nonetheless served. That is particularly true of someone deeply involved in a business with the family member who benefits financially from the fraud.

And I deem arguments about the Defendant's purportedly modest lifestyle to be irrelevant.

Given this record, the downward adjustment Nicholas seeks is unwarranted.

4) **The Government's objection to a downward adjustment under § 3E1.1(a)**

The Probation Office has performed Guideline calculations that give both Defendants credit for a three-level downward adjustment under §3E1.1(a). The Government objects, arguing that the degree to which the Defendants have litigated tax loss and advanced other arguments reflects a lack of truthfulness and a denial or responsibility. But just as I will bind Defendants to the terms of the plea agreements, so too will I bind the Government.

The plea agreements provide that "the defendants have demonstrated acceptance of responsibility for this offense, making the defendants eligible for a 2-level downward adjustment under U.S.S.G. Section 3E1.1(a). ECF 70 ¶ 11(c); ECF 71¶ 11(c). An additional 1-level downward adjustment has also been agreed to by the parties given defendants' acceptance of responsibility prior to the incursion of substantial resources for trial preparation." ECF 70 ¶ 11(d); ECF 71¶ 11(d). Thus, Defendants are entitled to the benefit of their agreements even as they contest the extent of their responsibility.

5) **Dispute as to the scope of restitution**

Defendants argue that in pleading guilty they only admitted to payroll fraud, and therefore cannot be ordered to pay restitution for income tax fraud, because "the count of conviction controls the amount of restitution." *United States v. Seligsohn*, 981 F.2d 1418, 1421 (3d Cir. 1992); *United States v. Akande*, 200 F.3d 136, 139 (3d Cir. 1999).[5] The Government responds that where a conviction is "the result of a plea bargain rather than the product of a jury verdict," the court must "look to the plea agreement and colloquy" to determine what constitutes the "offense of conviction." *Akande*, 200 F.3d at 142. Although the colloquy was limited to payroll fraud, the plea agreements for both Defendants provide that they each "further agree[] that the restitution [they] shall pay will include loss from relevant conduct as determined by the Court, but limited by the loss determined under the advisory sentencing guidelines." ECF 70 ¶ 6; ECF 71¶ 6.

As I read *Akande,* on the facts here, it gives controlling effect to the terms of the plea agreement. There, the Circuit observed that "[r]estitution is limited to amounts 'directly caused by

---

[5] Defendants also cite *United States v. Fallon*, 470 F.3d 542, 548 & n.12 (3d Cir. 2006), for the proposition that that restitution can only be ordered where the government establishes that "that the loss suffered was 'directly' caused by [the] defendant['s] actions." But *Fallon* involved victims of wire fraud, *id.* at 544, and specific Guidelines govern tax offenses. Section 2T1.1 permits consideration of all related conduct violating the tax laws. Application Note 2 to U.S.S.G. § 2T1.1.

the conduct composing the offense of conviction,' or those amounts that defendant 'expressly agree[s] to' pursuant to the plea agreement." 200 F.3d at 140 n.3. Although there is no specific amount set forth in the plea agreements, there is an express agreement to pay restitution that includes loss from "from relevant conduct as determined by the Court." The parties clearly contemplated further findings as part of the sentencing process and agreed to be bound by those findings. And the conduct for which the Government seeks restitution is directly related to the payroll scheme, which the Defendants admitted by their pleas of guilty on conspiracy to defraud the Government. I will therefore order restitution for the income tax losses, as well.

                                                   /s/ Gerald Austin McHugh
                                                   United States District Judge